**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
LIZA CHOI,

                 Plaintiff,

         -against-

FERRELLGAS, INC. and MICHAEL
GUADAGNO,

              Defendants.
--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION & ORDER**
2:17-cv-3518 (ADS) (SIL)

**FILED**
**CLERK**

4:29 pm, Jan 10, 2020

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

<u>**APPEARANCES:**</u>

**Kessler Matura P.C.**
*Attorneys for the Plaintiff*
534 Broadhollow Road, Suite 275
Melville, NY 11743
      By:    Marijana F. Matura, Esq.,
               Troy L. Kessler, Esq.,
               Tana Marie Forrester, Esq., Of Counsel.

**Scharnhorst Ast Kennard Griffin, PC**
*Attorneys for the Defendants*
1100 Walnut Street, Suite 1950
Kansas City, MO 64106
      By:    Brent M. Coverdale, Esq. (Pro Hac Vice)
               Cameron Everett Grant, Esq., Of Counsel.

**Jackson Lewis PC**
*Attorneys for the Defendants*
58 South Service Road, Suite 250
Melville, NY 11747
      By:    David S. Greenhaus, Esq., of Counsel.

**SPATT, District Judge**:

# I.   BACKGROUND

This action arises out of an employment dispute between Liza Choi (the "Plaintiff"), her former employer Ferrellgas, Inc., and one of her superiors at Ferrellgas, Michael Guadagno (the "Defendants").  The Plaintiff alleges that the announcement of her pregnancy set off a chain of events that concluded with her termination.  She raised claims under Title VII of the Civil Rights Act, as amended, 42 U.S.C. §§ 2000e *et seq.*, and as amended by the Pregnancy Discrimination Act ("Title VII"), the Family Medical Leave Act ("FMLA"), and the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq.* ("NYSHRL").  The Defendants move under Federal Rule of Civil Procedure ("FED. R. CIV. P.") 56 for summary judgment.

The background section has two parts.  The first part recounts the events leading up to the Plaintiff's termination, and the second part summarizes the claims raised in the present action, along with the pending summary judgment motion.  In the discussion section, the Court grants the summary judgment motion in its entirety and dismisses the action.

## A.  Events Leading to the Plaintiff's Termination

The following facts are taken from the parties' FED. R. CIV. P. 56.1 statements.  Unless noted, the facts are not in dispute.

### 1.  The Plaintiff's Employment History

The Plaintiff began working for a company called Mr. Bar-B-Q in August 2004 as an import coordinator.  She received a promotion to the position of import manager in April 2005. In March 2013, Defendant Ferrellgas acquired Mr. Bar-B-Q, and the Plaintiff began working for Defendant Ferrellgas.  That same year, the Plaintiff started reporting to Defendant Guadagno, the company's Vice President of Operations for Global Sourcing.

In her position as import manager, the Plaintiff supervised a staff of six employees, and her responsibilities included, *inter alia*, managing task force responsibilities for recommending organizational improvements, and working with Ferrellgas's sales team to build relationships with existing vendors and customers. Guadagno would periodically review the Plaintiff's performance, with the main focus of those reviews being "development goals." On September 8, 2013, in one such review, Guadagno noted that one of the Plaintiff's development goals was to "[b]reak down the communication barriers between the import department and the sales support teams at [Blue Rhino] and BBQ," which the Plaintiff understood as meaning that the two departments were to be sociable with one another. In an August 26, 2014 performance review, Guadagno noted that communication had "improved dramatically over the last 2 months."

In 2014, the Plaintiff was pregnant and was approved to take FMLA leave. She lost her baby during that 2014 pregnancy, and afterwards, she received FMLA and short-term disability leave. At least two other Ferrellgas employees had been pregnant while under Guadagno's supervision.

In March 2015, Guadagno proposed to company management a "Global Supply Chain Initiative," which would merge Ferrellgas's import and sales departments into one team, called the "Global Supply Chain team." Part of that proposed merger included reassigning the managers of the two teams, the Plaintiff and Lauren Buccello, and bringing in an outside person to manage the two newly merged departments. Guadagno also proposed making the Plaintiff that outside manager as the company's "Global Logistics manager." Although Guadagno's supervisors approved of this initiative, there was no money to fund the outside manager position, and the Plaintiff remained in her position as import sales manager.

The Parties disagree with regard to the Plaintiff's conduct and demeanor in the workplace. The Defendants allege the following. In March 2015, Guadagno discussed removing Choi from the import manager position because, although she was "very bright," she was an abusive manager who was unable to overcome feeling victimized by the mistakes of others. ECF 45-1 at 3. Guadagno proposed making the Plaintiff the Global Logistics manager because he thought that the Plaintiff would succeed in managing "process" instead of managing people. *Id.* at 4. However, Guadagno's supervisors did not approve the initiative, and the Plaintiff remained in her position. *Id.*

The Defendants also cataloged a list of the Plaintiff's behavior that they deemed unacceptable. Guadagno e-mailed the Plaintiff in December 2014 about an instance in which he thought she had been "rough" with a co-worker, but the Plaintiff disagreed with his assessment. *Id.* at 5–6. In a September 2015 performance review, Guadagno lowered the Plaintiff's "personal leadership" score; reiterated his concerns with the Plaintiff's incapacity to "rise above feeling victimized by business issues"; and felt that Choi had become more accusatory towards her subordinates. *Id* at 4–5. In November 2015, following a correspondence between the Plaintiff, a co-worker, and Jeff Lynch, the Vice President of Global Sales, Lynch wrote to Guadagno, saying that he "[could] not wait for the day when [he would] never have to have any interaction with her EVER again." *Id.* at 6–7. That same month, the Plaintiff admitted to adding an item to the company's daily bulletin that was poorly received by employees, and Guadagno cautioned her to be more professional. *Id.* at 7–8.

Multiple employees under the Plaintiff's supervision approached Guadagno to complain about her. *Id.* at. 9. By December 2015, Guadagno believed that while the Plaintiff was aware of his concerns about her interaction with others; that she was either unable to or unwilling to

change; and that he was afraid that her conduct would cost Ferrellgas employees on its import team. *Id.* at 9–10. He also still valued the Plaintiff as an employee, so he decided to reassign her to a position similar to the global logistics role he had previously attempted to create. *Id.* at 10. The Plaintiff does not dispute that the above-listed events occurred, but she challenges the Defendants' descriptions of her demeanor.

The Plaintiff alleges the following. Guadagno had conducted three performance reviews with the Plaintiff between September 2013 and September 2015, and none of those reviews documented the Plaintiff as being abusive, in her tone or in her behavior. ECF 48 at 6–7. Guadagno also gave her several raises during this time. *Id.* at 6. In March 2015, when Guadagno had first sought to move the Plaintiff to the global logistics position, he praised the Plaintiff when proposing the role and again, did not cite her apparent history of abusive behavior. *Id.* at 6, 8. In the three above-noted performance reviews, Guadagno gave the Plaintiff high scores for her ability to manage her staff. *Id.* at 9–10. She cites an email sent from Guadagno to Lynch in March 2015 in which he praised the Plaintiff as an employee. Guadagno also told the Plaintiff that, in the aftermath of the email exchange with Lynch, that he supported her and that he was working on getting her a promotion. *Id.* at 18.

She also asserts that to the extent that the Defendants use argumentative and conclusive language throughout the Rule 56.1 statement, which is inconsistent with the requirements of FED. R. CIV. P. 56.1 and Local Rule 56.1. *See, e.g.*, *id.* at 9. However, the Defendants claim that the Plaintiff fails to identify any argumentative or conclusive language from the Rule 56.1 statement. *See, e.g.*, ECF 51 at 15, 16, 18.

In reply, the Defendants argue that in the email to Lynch, Guadagno also noted that the Plaintiff and a co-worker, Buccello, could not see eye to eye, and that he was proposing the

global logistics role in order to create more efficiency for Ferrellgas by keeping the two employees away from competing departments. ECF 51 at 2. The Defendants also assert that the lack of formal documentation on the Plaintiff's managing style do not bear on Guadagno's view about the Plaintiffs behavior or the difficulty he experienced in managing her, and that even though Guadagno believed in the Plaintiff, he still would point out her problematic behavior. *Id.* at 8, 17.

### 2. The December 18, 2015 Meeting and The Plaintiff's "Cooling Off" Period

On December 18, 2015, Guadagno, along with Ferrellgas's Director of Employee Relations Mary Lentz, met with the Plaintiff to discuss the company's concerns with her ability to meet the expectations of her management position; namely, her issues with managing people and interacting with vendors and senior managers. Guadagno gave the Plaintiff a Performance Improvement Plan ("PIP"), stating that: (1) four of six employees that had worked for her said she was verbally abusive and looking for issues to complain about, two of those employees had since left the company; (2) the Plaintiff had "been abusive to a Vice President with abrasive emails"; (3) the Plaintiff's behavior had caused other teams at Ferrellgas to avoid communicating with her department or members of her team; and, (4) the Plaintiff had been verbally abusive to the company's vendors. In addition, the PIP informed the Plaintiff that she would no longer manage the import department, and that she would be sent home, with pay, for two weeks for a "cooling off period."

At the time of this meeting, Choi was 33 weeks pregnant, with an anticipated due date in early February 2016. Guadagno never expressed any concerns about Choi's being absent from work for doctor's appointments. The Defendants assert that Guadagno never indicated to Choi that he had some concern with the Plaintiff's being pregnant, and that Choi testified that no one

at Ferrellgas made any such comments. ECF 48 at 12. However, the Plaintiff argues that in spring 2015, Guadagno made a comment to the Plaintiff about another pregnant employee, Selena Puras, telling her that the company would not be keeping her because she was pregnant. ECF 48 at 29. She further asserts that people at the company made comments about the length of her doctor's appointments, and that her predecessor in the import manager position was terminated after returning to work following a high-risk pregnancy. *Id.* at 30. She also says that she was fired because the company felt that she couldn't commit herself to them, but she does not elaborate on this or identify any Ferrellgas employee who complained about her lack of commitment. *Id.*

In reply, the Defendants allege that the Plaintiff lacks personal knowledge of any specific comments made by Guadagno showing animus over Puras's pregnancy. ECF 51 at 28. They also note that the Plaintiff does not identify anyone at Ferrellgas who was not happy about her lack of commitment. *Id.* at 30.

Choi received paid leave during her "cooling off" period, and the company did not deduct any of her vacation time. She returned to work on January 6, 2016, and her pay rate and career level remained the same as it was with the import manager position.

### 3. The Plaintiff's FMLA Leave and Return to her New Role

The Defendants assert that Guadagno planned to develop a role for the Plaintiff that contained some of the same responsibilities as her previous position, but emphasized focusing on data collection and resolving the company's struggles with tracking expenses. However, Guadagno had little time to develop this position because the Plaintiff went on FMLA leave the day after she returned to work. ECF 45-1 at 12–13. The Plaintiff contends that Guadagno was unsure of the specifics of her new job, and that he did not share with her a job description until

April 1, 2016, when she returned from FMLA leave. ECF 48 at 30–31. In fact, Guadagno had written to a co-worker on December 18 that he had moved the Plaintiff into a placeholder position that would be further discussed upon her return from leave. *Id.* at 31.

The Plaintiff gave birth to her child on January 8, 2016. On January 24, 2016, while the Plaintiff was still on leave, she sent Guadagno a memorandum responding to Guadagno's December 18 PIP. The memorandum contained the following language:

> While I feel blindsided and betrayed by these accusations and your removing me from my position of Import Manager, I also find the timing of this completely unexpected decision/action was very peculiar. As you are well aware, at the time of our afternoon meeting on Friday, December 18, 2015, I was pregnant with an expected due date in early February 2016. In fact, as of December 18, 2015, I was in the 33rd week of my pregnancy. The shocking accusations and your decision/action to bar me from going to the office for two weeks during the so-called "cooling off period" and during the Christmas/New Year holidays, and in my current state of pregnancy, left me essentially unable to bring any action to defend myself. As is the case, I gave birth prematurely two weeks ago and am now on maternity leave under the [FMLA] and the New York Family and Medical Leave Laws. For you to hastily remove me from the position of Import Manager this close to my impending maternity leave and without any forewarning makes me wonder about the timing of it all. After what happened to me on December 18, 2015, I simply do not believe in coincidences.

The parties disagree as to whether the Plaintiff felt that Guadagno or others at Ferrellgas were upset about those comments. ECF 45-1 at 15, ECF 48 at 35. Choi returned to work on April 1, 2016, receiving a job description from Guadagno and a formal title for her new position; import operations expense auditor. Guadagno created this position from "tasks required from other positions."

The Defendants contend that Guadagno created the position because it would allow the Plaintiff to capitalize on her experience with the company, and that the job contained "important functions to operations within Ferrellgas." ECF 45-1 at 14. However, the Plaintiff alleges that while she was on FMLA leave, the logistics portion of her new role was assigned to another

employee, and that when she returned from leave, she didn't have enough work to do, and the work she did have consisted of redundant tasks. ECF 48 at 34. In reply, the Defendants note that it is immaterial that Guadagno placed the Plaintiff in a position that he later eliminated, because it would require a jury to assume that Guadagno could predict that future layoffs were coming. ECF 51 at 23–24, 40–41. They also argue that the Plaintiff's subjective view that the new role was redundant is insufficient to create a genuine dispute as to Guadagno's testimony regarding his plan for the Plaintiff's new position. *Id.* at 32, 34–35, 37–38.

### 4. The End of The Plaintiff's Employment

Ferrellgas typically considers reductions in force ("RIFs") during April and May of each year as it plans the next year's fiscal budget. In the spring of 2016, Ferrellgas experienced financial difficulties, and the Plaintiff was aware of those difficulties. The company laid off more than 100 people, and employees who remained did not receive raises for at least two years.

The company's division and local managers were responsible for determining which positions were essential. Guadagno determined that he needed to make RIFs, and he decided to eliminate the Plaintiff's position. On May 18, 2016, he emailed Lentz—Ferrellgas's Director of Human Relations, who attended the December 18, 2015 meeting with the Plaintiff and Guadagno—telling her that the company needed to fire the Plaintiff because the "budgets are tight." At least two male employees in the Plaintiff's office also were subject to RIFs. The Defendants assert that Guadagno did not wish to fire the Plaintiff; that he intended the import operations expense auditor position to be a permanent one, but he came to believe that it was "more after the fact audit related"; that he reached his decision shortly before firing her; and that he viewed firing her as part of a company-wide cost-cutting measure. ECF 45-1 at 17 (internal quotation marks omitted). However, the Plaintiff asserts that Guadagno did not have a plan for

her once he removed her from her role as import manager, and that he decided to eliminate her upon assigning her to a role that consisted of redundant and non-essential tasks, a role that did not exist prior to his creating it for her. ECF 48 at 38–40. In addition, the Plaintiff contends that Ferrellgas did not investigate or write a report about the Plaintiff's complaint of pregnancy discrimination. ECF 48 at 42.

In reply, the Defendants contend that concerns about the Plaintiff's new role being undefined are irrelevant, because Guadagno changed the Plaintiff's position because he could no longer afford to keep her as a manager. ECF 51 at 4. They also state that allegations concerning's Lentz's investigation of the Plaintiff's complaint are irrelevant to Guadagno's intent. *Id.* at 45.

### B. The Present Action

The Plaintiff brought the present action in June 2017 against Ferrellgas and Guadagno. ECF 1. The Plaintiff alleged that she informed the Defendants of her pregnancy in July 2015. *Id.* at 4. She raised claims for FMLA retaliation against Ferrellgas; Title VII discrimination against Ferrellgas; Title VII retaliation against Ferrellgas; NYSHRL discrimination against all Defendants; and, NYSHRL retaliation against all Defendants. *Id.* at 8–11. She asked for a declaratory judgment; compensatory damages; punitive damages; liquidated damages; pre-judgment interests; and attorneys' fees and costs. *Id.* at 11.

The Defendants now move under FED. R. CIV. P. 56 for summary judgment.

## II. DISCUSSION

The Defendants move for summary judgment as to each of the Plaintiff's claims. For the following reasons, the Court grants that motion in its entirety, and dismisses the action.

## A. Legal Standard For Summary Judgment

FED. R. CIV. P. 56(a) provides that a court may grant summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

"A genuine issue of fact means that 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Wright v. Goord*, 554 F. 3d 255, 266 (2d Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "Where the moving party demonstrates 'the absence of a genuine issue of material fact,' the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). "The evidence of the party opposing summary judgment is 'to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Wright*, 554 F.3d at 266 (parenthetically quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)). However, to defeat a motion for summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010).

"When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

**B. As to the Plaintiff's FMLA Retaliation Claim**

**1. Legal Standard**

The FMLA provides "broad protections" for employees needing to take time away from work to contend with serious health conditions, either for themselves or their families. *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 165 (2d Cir. 2017). Under the FMLA, an employee has the right to return to the position she held before taking leave, or to an "equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. 2614(a)(1)(B). The FMLA also "creates a private right of action to seek both equitable relief and money damages against any employer in any Federal or State court of competent jurisdiction, should that employer interfere with, restrain, or deny an employee's exercising of rights under the statute. *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006).

An FMLA retaliation claim involves "an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer." *Woods*, 864 F.3d at 166. Courts analyze FMLA retaliation claims pursuant to the burden-shifting test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016); *Potenza v. City of New York*, 365 F.3d 165, 167–68 (2d Cir. 2004). "To establish a prima faci[e] case of FMLA retaliation, a plaintiff must establish that (1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012) (internal quotation marks omitted). The

plaintiff's burden at this stage is "minimal." *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008).

A plaintiff "must demonstrate that [her] taking FMLA leave constituted a negative factor in [the defendant's] decision to terminate her." *Smith v. N. Shore-Long Island Jewish Health Sys.*, 286 F. Supp. 3d 501, 511 (E.D.N.Y. 2018) (internal quotation marks and ellipses omitted). If the plaintiff makes out a *prima facie* case for retaliation, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that the defendant's proffered explanation is pretextual. *Graziadio*, 817 F.3d at 429 (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)).

### 2. Application to the Facts of This Case

#### a. The Parties' Arguments

The Defendants contend that the Plaintiff lacks sufficient evidence to establish a *prima facie* case of retaliation under the FMLA. ECF 47 at 5–10. They raise arguments as to prongs (3) and (4) of the retaliation standard. As to prong (3), they argue that the Plaintiff's cooling off period and transfer to the new position did not constitute adverse employment actions. *Id.* at 5–7. As to prong (4), they assert that the Plaintiff lacks sufficient evidence to show that the circumstances gave rise to an inference of retaliation, because she lacks a direct showing of retaliatory animus; she does not show sufficient evidence of disparate treatment; she does not show a temporal proximity between a protected activity and an adverse employment action; and she lacks sufficient evidence of any other circumstance that could give rise to an inference of retaliatory intent. *Id.* at 7–10.

In the alternative, the Defendants argue that even if the Plaintiff made out a *prima facie* case of retaliation, that Ferrellgas had legitimate, non-retaliatory reasons for asking the Plaintiff

to stay home for two weeks and then to transfer to a new position, and that the Plaintiff lacks any evidence of pretext. *Id.* at 10–13. Those non-retaliatory reasons are that Ferrellgas could not afford to lose other employees because of the Plaintiff's confrontational attitudes towards them, the way she managed people, and her unwillingness to change her outlook. *Id.*

The Plaintiff opposes the motion for summary judgment, arguing that genuine issues of material fact exist as to the FMLA claim; that she has established a *prima facie* retaliation claim; that the Defendants lacked a non-retaliatory reason for firing her; and, that the Defendants proffered reasons for reassigning and terminating her are pretext for retaliation. ECF 49. In particular, she argues that the parties submitted two sets of conflicting material facts concerning the circumstances, purpose, and timing of her reassignment to a short-lived position as import operations expense auditor and her subsequent termination. *Id.* at 15–17. She claims to have stated a *prima facie* retaliation case because she (1) engaged in protected activity when she took FMLA leave; (2) she was qualified for her position; (3) the Defendants were aware of her pregnancy discrimination complaint; and (4) in reassigning her to a marginal position and then terminating her, the Defendants took adverse action against her. *Id.* at 18–20. She claims that the Defendants lacked a non-discriminatory reason to fire her because of her history of positive performance reviews, and that the Defendants' actions were pretextual, given their contradictory facts on why she was reassigned and the motivation for her termination. *Id.* at 22–23.

In reply, the Defendants argue that the Plaintiff fails to demonstrate the intent to terminate her for taking FMLA leave at any point between her taking the leave and her termination four months later. ECF 50 at 6. They also contend that the Plaintiff lacks sufficient evidence showing that the proffered reason for her termination, as part of a company-wide RIFs, was pretextual. *Id.* at 6–7.

The Court grants the summary judgment motion as to the FMLA retaliation claim, because, although the Plaintiff arguably states a *prima facie* retaliation claim as to her reassignment to import operations expense auditor, the Defendants had a non-retaliatory and non-pretextual motive for their actions.

### b. Adverse Employment Actions

It is undisputed that the Plaintiff meets the first two prongs of the FMLA retaliation standard. The parties disagree on whether the Plaintiff suffered an adverse employment action, and whether any adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.

As to the former, for purposes of FMLA retaliation, an adverse employment action is "any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising h[er] legal rights." *Millea v. Metro–N. R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011). "[T]he test is whether a 'reasonable' employee would be deterred, and does not take into consideration a plaintiff's 'unusual subjective feelings.'" *Dearden v. GlaxoSmithKline LLC*, No. 15-CV-7628, 2017 WL 4084049, at *8 (S.D.N.Y. Sept. 14, 2017) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68–69, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). For instance, "'petty slights, minor annoyances, and simple lack of good manners will not' give rise to actionable retaliation claims." *Millea*, 658 F.3d at 165 (quoting *Burlington*, 548 U.S. at 68, 126 S. Ct. 2405). "In determining whether conduct amounts to an adverse employment action, the alleged retaliation needs to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (citation omitted). Courts apply the same standard for

determining adverse employment actions in Title VII claims as they do in FMLA claims. *Millea*, 658 F.3d at 164.

Here, the Plaintiff alleges her reassignment from import manager to import operations expense auditor constituted an adverse employment action. She also claims that her termination constituted an adverse employment action. An adverse employment action "is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015). The Second Circuit has ruled that the reassignment of a teacher to a different classroom, following her return from FMLA leave, and allegedly ignoring the teacher's complaints about students, were not adverse employment actions. *Davies v. New York City Dep't of Educ.*, 563 F. App'x 818, 820 (2d Cir. 2014) (summary order). The Eastern District has ruled that an unwanted shift change also does not amount to an adverse employment action. *Hamedl v. Weiland*, No. 10-CV-2738, 2012 WL 3903499, at *8 (E.D.N.Y. Sept. 6, 2012). However, the Second Circuit has also ruled that "significantly diminished material responsibilities" may constitute an adverse employment action. *Vega,* 801 F.3d at 85; *Davies*, 563 F. App'x at 820.

The Defendant has alleged that upon returning from FMLA leave, her new role at Ferrellgas consisted of redundant tasks, and a portion of her new job had been reassigned to someone else before she had started. The Court rules that this new position constituted a sufficiently adverse employment action, by way of significantly diminished material responsibilities, for the purposes of making out a *prima facie* retaliation claim. *See Vega*, 801 F. 3d at 85; *Davies*, 563 F. App'x at 820; *Smith v. Westchester Cty.*, 769 F. Supp. 2d 448, 470 (S.D.N.Y. 2009). In addition, the Court notes that termination of employment is one of the

traditional examples of an adverse employment action.  *See Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225–26 (2d Cir. 2006).

### c.  An Inference of Retaliatory Intent

Having established the first three prongs of a retaliation claim, the Court still must determine whether the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.  To establish such an inference, a party must provide a basis for a jury to conclude that "'a causal connection [exists] between the plaintiff's protected activity and the adverse action taken by the employer.'"  *Donnelly*, 691 F.3d at 152 (quoting *Mack v. Otis Elevator Co.*, 326 F.3d 116, 129 (2d Cir. 2003)).  A party proves causation "(1) directly through evidence of retaliatory animus directed against the plaintiff by the defendant; or (2) indirectly either by (a) showing that the protected activity was followed closely by discriminatory treatment, or (b) through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct."  *Williams v. Cty. of Nassau*, No. 15-CV-7098, 2019 WL 2270518, at *11 (E.D.N.Y. May 28, 2019) (internal citations omitted) (citing *D'Andrea v. Nielsen*, 765 F. App'x 602, 605 (2d Cir. 2019) (summary order).

The Second Circuit has ruled that a plaintiff establishes an indirect "causal inference" by way of "'very close' temporal proximity" between the taking of FMLA leave and an adverse employment action.  *Donnelly*, 691 F.3d at 152.  Courts "frequently find a period of a few weeks sufficient to allow a jury to infer a causal connection between the protected act and the adverse employment action."  *Fernandez v. Woodhull Med. and Mental Health Ctr.*, No. 14-CV-4191, 2017 WL 3432037, at *8 (E.D.N.Y. Aug. 8, 2017); *see Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 835 (2d Cir. 2013) ("The three-week period from [the plaintiff's] complaint to her termination is sufficiently short to make a prima facie showing of causation indirectly through

temporal proximity."); *Feingold v. New York*, 366 F.3d 138, 156 (2d Cir. 2004) (ruling that an issue of fact existed as to retaliation causation where supervisors recommended terminating the plaintiff two weeks after his complaint); *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002) ("The temporal proximity between [plaintiff's] protected activity in February 1998 and the allegedly adverse employment actions in March 1998 is sufficient to establish the required causal link.").

Conversely, courts have "consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation." *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007); *see Kim v. Goldberg, Weprin, Finkel Goldstein, LLP*, 862 F. Supp. 2d 311, 319 (S.D.N.Y. 2012); *see also Ruhling v. Tribune Co.*, No. 04-Civ-2430, 2007 WL 28283, at *23 (E.D.N.Y. Jan. 3, 2007). Courts generally do not extend a causal relationship to these longer timespans because they are "simply too attenuated to establish that the alleged adverse employment actions were the product of a retaliatory motive." *Brown v. City of New York*, 622 F. App'x 19, 20 (2d Cir. 2015) (summary order) (time lapses of "two months to several years"); *see Lebowitz v. New York City Dep't of Educ.*, 407 F. Supp. 3d 158, 179 (E.D.N.Y. 2017). Despite this general practice, "it is the role of the court to exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Stern v. State University of New York*, No. 16-CV-5588, 2018 WL 4863588, at *17 (E.D.N.Y. Sept. 30, 2018) (ruling Plaintiff made out *prima facie* claim despite four-and-a-half-month gap).

In this case, the Plaintiff alleges a timespan of nine weeks between her January 24, 2016 complaint of pregnancy discrimination and her April 1, 2016 reassignment, and another timespan

of approximately four months between her complaint and her termination. ECF 49 at 21–22. She relies mainly upon a Title VII retaliation claim where the court ruled that alleged adverse employment actions happening between two and eleven months after the employee engaged in protected activity "at least arguably, occurred within a time frame that could support a causal connection." *Williams*, 2019 WL 2270518, at *12.

The Court rules that the Plaintiff states a *prima facie* claim for retaliation with regard to her reassignment. The gap between the complaint and the reassignment is approximately two months, which, although close to the arbitrary deadline imposed by most courts, is close enough to this timeframe to survive summary judgment. *See Ottley-Cousin v. MMC Holdings, Inc.*, No. 16-CV-577, 2019 WL 1994488, at *18 (E.D.N.Y. May 6, 2019); *Emmons v. City Univ. of New York*, 715 F. Supp. 2d 394, 418 ("Emmons's allegation that she was fired approximately two months following her FMLA leave does state a claim for FMLA retaliation."); *see also Potenza*, 365 F.3d 165, 168 (2d Cir. 2004) ("The fact that a two-month delay intervened between Potenza's return to work and his removal as port engineer does not completely vitiate his claim.").

However, the Court grants the Defendants' summary judgment motion and denies the Plaintiff's retaliation claim with regard to her termination. Notwithstanding the decision in *Williams*, in the Court's view, a four-month time gap between protected activity complaint and termination precludes a causal connection in the balance of decisions from this Circuit, especially where, as here, the Plaintiff alleges a causal connection based on temporal proximity alone. *See Barletta v. Life Quality Motor Sales, Inc.*, No. 13-CV-2480, 2016 WL 4742276, at *5 (E.D.N.Y. Sept. 12, 2016) (determining that a four month gap between FMLA leave and termination was insufficient to give rise to inference of retaliation); *Kim*, 862 F. Supp. 2d at 319

("Therefore, the four month gap between Kim's 2009 Leave and her termination precludes the Court from presuming that there was a causal connection based on temporal proximity alone."); *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 503–04 (S.D.N.Y. 2010) ("The cases that accept mere temporal proximity between . . . protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.") (internal quotation marks omitted).

Accordingly, the Plaintiff only states a *prima facie* FMLA retaliation claim with regard to her reassignment. The burden shifts to the Defendants to offer a non-retaliatory purpose for the Plaintiff's reassignment.

### d. Non-Discriminatory Motive and Pretext

The Defendants assert their non-retaliatory reason for reassigning the Plaintiff was her problematic management style, one that did not improve despite repeated requests for her to change her behavior. ECF 47 at 10–13. The Plaintiff contends that the Defendants maneuvered her into a non-essential role as she neared the end of her pregnancy. ECF 49 at 22–23.

The Court rules that the Defendants have met their burden of establishing a non-retaliatory motive for reassigning the Plaintiff. It is uncontested that multiple employees approached Guadagno about their troubled relationship with the Plaintiff as a manager; that other management level employees had complained to Guadagno about the Plaintiff; and, that Guadagno met with Plaintiff in December 2015 to discuss his concerns about her management style. It is further undisputed that Guadagno made no comments to Choi indicating concern about Choi's pregnancy or about her missing time from work. *See Skates v. Inc. Vill. of Freeport*, 265 F. Supp. 3d 222, 241–42 (E.D.N.Y. 2017) (observing that the Defendant "submitted the [c]harges and [s]pecifications outlining the bases for the Plaintiff's termination.");

*see also Colon*, 983 F. Supp. 2d at 287–88 ("Defendants offer Colon's documented history of tardiness and absence as their legitimate, nondiscriminatory reason for her termination. Colon must now show that this reason is a pretext.").

In addition, the Court rules that the Plaintiff fails to make a showing that the Defendants' reasons for reassigning her were pretextual. She claims that the Defendants have offered contradictory facts concerning the motivation for creating the Plaintiff's new position: that while they imply Guadagno had a specific plan for the Plaintiff at the time of the December 2015 meeting, Guadagno emailed Lynch on December 30 saying he had "moved Liza into that spot as a place holder, and we will discuss her future when she returns from leave." ECF 49 at 23. However, this additional information does not sustain the Plaintiff's retaliation claim. *See Alexander v Bd. of Educ. of City of N.Y.*, 648 F. App'x 118, 122 (2d Cir. 2016) (summary order) ("[S]uch isolated remarks are insufficient to carry Alexander's burden at the summary judgment stage."); *see Hayut v. State Univ. of New York*, 352 F.3d 733, 743 (2d Cir. 2003) ("The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."); *Philippe v. Santander Bank, N.A.*, No. 15-CV-2918, 2018 WL 1559765, at *12 (E.D.N.Y. Mar. 31, 2018).

The Court also rules, in the alternative, that for the above-noted reasons, the Defendants had legitimate, non-discriminatory reasons for firing the Plaintiff. They also had the further justification of needing to make reductions in staff as part of the company-wide RIFs, a fate that multiple co-workers in the Plaintiff's office suffered alongside her, and a decision that occurred in the early spring, which the parties do not dispute is the customary time for Ferrellgas to consider whether to lay off employees. *See, e.g.*, *Maitland v. Konica Minolta Bus. Sols. U.S.A. Inc.*, No. 09-CV-1675, 2016 WL 304884, at *7, *12 n.12 (E.D.N.Y. Jan. 25, 2016).

**C. As to the Plaintiff's Title VII and NYSHRL Discrimination Claims**

**1. Legal Standards**

Title VII prohibits discrimination with respect to the terms, conditions, or privileges of employment because of a person's sex. 42 U.S.C. § 2000e–2(a)(1). In 1978, Congress passed the Pregnancy Discrimination Act (the "PDA"), which expressly overruled the Supreme Court's holding in *General Electric Company v. Gilbert*, 429 U.S. 125, 97 S. Ct. 401, 50 L. Ed. 2d 343 (1976), that pregnancy discrimination is not sex discrimination. The PDA contributed the following to Title VII's definitional section:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work.

Pub. L. 95-555, 92 Stat. 2076 (1978) (codified at 42 U.S.C. § 2000e(k)); *see Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 670–71 & n.1, 103 S. Ct. 2622, 77 L. Ed. 2d 89 (1983). That provision "makes clear that it is discriminatory to treat pregnancy-related conditions less favorably than other medical conditions." *Newport News*, 462 U.S. at 684, 103 S. Ct. 2622.

Similar to other Title VII discrimination claims, courts apply "the three-step burden shifting analysis" of *McDonnell Douglas*. *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400–01 (2d Cir. 1998). A PDA plaintiff establishes a *prima facie* case of discrimination "by showing that: (1) she is a member of a protected class; (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) . . . the discharge occurred in circumstances giving rise to an inference of unlawful discrimination." *Id.* at 401 (internal quotation marks omitted); *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019).

A plaintiff's burden in establishing this *prima facie* case is minimal. *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (collecting cases). "An employee who alleges statute-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013). The relevant test is not but-for causation; "[i]t suffices instead to show that the motive to discriminate was *one of the employer's motives*, even if the employer also had other, lawful motives that were causative in the employer's decision." *Id.* (emphasis added).

If a plaintiff establishes a *prima facie* case, "a presumption of discriminatory intent arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its policy or action." *Legg v. Ulster Cty.*, 820 F.3d 67, 73 (2d Cir. 2016). "If the employer puts forth a legitimate, non-discriminatory justification, the presumption drops out of the analysis and the plaintiff must establish, by a preponderance of the evidence, that the employer's justification is a pretext for discrimination." *Id.* at 73–74.

Courts "typically treat Title VII and NY[S]HRL discrimination claims as analytically identical, applying the same standard of proof to both claims." *Salomon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008); *see Graziano v. First Choice Med., PLLC*, No. 17-CV-1349, 2019 WL 4393668, at *5 (E.D.N.Y. Sept. 13, 2019).

### 2.  Application to the Facts of This Case

The Defendants allege that the Plaintiff's claims fail because she did not suffer an adverse employment action when "she was asked to stay home for two weeks and then transferred from the Import Manager Position." ECF 47 at 17. They also contend that "as to allegations that Ferrellgas ended her employment due to her gender or her pregnancy," that claim

fails because she cannot show that she was a member of a protected class at the time of her termination. *Id.* They also argue that the Plaintiff fails to show that the circumstances of her termination created an inference of discrimination, given that the Plaintiff had previously been pregnant in 2014 and remained employed with Ferrellgas, and that at least two other employees had been pregnant and given birth while under Guadagno's supervision. *Id.* In addition, they assert that they had legitimate, non-discriminatory reasons for their actions, and that the Plaintiff cannot show that the reasons were pretextual.

In opposition, the Plaintiff argues that she was a member of a protected class at the time of her reassignment, and that an employee who suffers an adverse employment action soon after returning from maternity leave remains a member of a protected class. ECF 49 at 9. She further argues that she was qualified for her position; that she suffered adverse employment actions upon her reassignment and her termination; that the Defendants filled her position with a non-pregnant employee; and that they also changed their perception of her from positive to negative upon learning of her pregnancy, giving rise to an inference of discrimination. *Id.* at 9–13. The Plaintiff also alleges that the Defendants lack a legitimate, non-discriminatory reason for their actions, and that those actions constituted pretext for discrimination. *Id.* at 13–15.

The Defendants in reply argue that the Plaintiff fails to establish that she was still a member of a protected class at the time of her termination. *Id.* at 7. They also argue that the plaintiff lacks sufficient evidence to show that her pregnancy caused her termination, or that their proffered reason for her termination was pretext. *Id.* at 8.

The Court grants the Defendants' summary judgment motion as to the Title VII and NYSHRL discrimination claims, for the following reasons. As to the discrimination claims concerning the Plaintiff's reassignment, for the reasons listed in the section on FMLA retaliation,

the Court rules that the Plaintiff has met her *prima facie* burden of alleging an adverse employment action. *Millea*, 658 F.3d at 164 (applying same standard for adverse employment actions in FMLA and Title VII actions). In addition, the Plaintiff meets her *prima facie* burden in alleging that a non-pregnant person replaced her as import manager. *See Habe v. 33 Bayville Ave. Rest. Corp.*, No. 09-CV-1071, 2012 WL 113501, at *3 (E.D.N.Y. Jan. 13, 2012). Also, for the above-noted reasons, the Court rules that Defendants had a legitimate, non-discriminatory reason for reassigning the Plaintiff, and that the Plaintiff fails to demonstrate that this legitimate reason was pretext.

As to the claims concerning the Plaintiff's termination, the Plaintiff correctly argues that a plaintiff "need not be pregnant at the time of termination to be a member of the PDA's protected class." *Briggs v. Women in Need, Inc.*, 819 F. Supp. 2d 119, 127 (E.D.N.Y. 2011); *see also Albin v. LVMH Moet Louis Vuitton, Inc.*, No. 13-CV-4356, 2014 WL 3585492, at *4 (S.D.N.Y. Jul. 8, 2014). "Distinguishing among previously pregnant women to determine who is still affected by pregnancy requires selecting a temporal cutoff based on the facts of the given case." *Albin*, 2014 WL3585492, at *4 (citing *Briggs*, 819 F. Supp. 2d at 127). For instance, courts have ruled that an employee terminated "soon after returning from maternity leave, is a member of the protected class." *Briggs*, 819 F. Supp. 3d at 127. In *Quaratino v. Tiffany & Co.*, the Second Circuit ruled that the Plaintiff was a member of a protected class when she was terminated less than four months after giving birth. 71 F.3d 58, 64 (2d Cir. 1995).

However, the period after giving birth during which a woman remains a member of a protected class has limits. *See White v. City of New York*, No. 13-Civ-7156, 2014 WL 4357466, at *15 (S.D.N.Y. Sept. 3, 2014). Courts make this determination on a case-by-case basis, *Briggs*, 819 F. Supp. 2d at 127, but "a pattern has developed in this Circuit establishing a loose line at

approximately four months from the date of birth." *Albin*, 2014 WL 358542, at *4; *see Pellegrino v. Cty. of Orange*, 313 F. Supp. 2d 303, 317 (S.D.N.Y. 2004).

The Plaintiff here gave birth on January 8, 2016, and she was terminated on May 18, 2016, a gap of approximately four months. Pursuant to the "loose line" established in this Circuit, the Court rules that the Plaintiff remained a member of a protected class at the time of her termination. *See Albin*, 2014 WL 358542, at *4.

As to whether the circumstances of the Plaintiff's termination gave rise to an inference of discrimination, the Plaintiff bases her argument on her position being filled by a non-pregnant person, and her being treated differently after announcing her pregnancy. A Title VII plaintiff may satisfy the fourth prong of the *prima facie* standard for discrimination by demonstrating the ultimate filing of a position with an individual who is not a member of the protected class, or, alternatively, by showing that her discharge occurred under circumstances giving rise to an inference of discrimination on the basis of her membership in that class. *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001).

The Plaintiff fails to make out the fourth prong of this standard with regard to her termination, and thus, she does not make out a *prima facie* claim. The Plaintiff refers to her history of positive performance evaluations prior to announcing her pregnancy. However, the Plaintiff received a performance evaluation in September 2015, following her pregnancy announcement, that she described as positive. *See* ECF 48 at 4 ("Guadagno gave Choi a performance review on September 9, 2015 . . . [and] he scored her as a 4 out of 5 in the category of manage staff performance." ) (internal citation and quotation marks omitted), 6 ("Guadagno conducted three performance review of the Plaintiff, none of which document abusive tones or

behavior.") (citing the September 2015 review).  This review undercuts the Plaintiff's position

that announcing her pregnancy led to her reassignment and termination.

It is also undisputed that the Plaintiff had ongoing conflicts with the Defendants with

regard to her management of employees, and the Plaintiff testified that Guadagno would

periodically address this issue with her.  ECF 48-4 at 44; *see Wontrobski v. S. Huntington Union

Free Sch. Dist.*, No. 02-CV-3755, 2005 WL 1785261, at \*4 (E.D.N.Y. June 26, 2005)

("Similarly, Plaintiff testified that she began receiving negative evaluations in early 2001 after

she announced her pregnancy, but she also testified that she received a negative evaluation . . .

prior to her pregnancy.").  Further, the Court notes that the Plaintiff does not allege having

experienced discrimination during her previous pregnancy.  *See, e.g.*, *Rinsler v. Sony Pictures

Entmt., Inc.*, No. 02-Civ-4096, 2003 WL 2205434, at \*6 (S.D.N.Y. Aug. 25, 2003) ("In fact, the

record is replete with examples of the defendants' sensitivity to Rinslers's condition.").

Even assuming, *arguendo*, that the Plaintiff had made out a *prima facie* case of

pregnancy discrimination based on her termination, she fails to show that the Defendants'

purported reasons for terminating her—the company-wide RIFs—were mere pretext.  She

disregards the ongoing conflict with the Defendants over her managerial style, including issues

that she did not dispute from the Defendants' Rule 56.1 statement.  In the company-wide RIFs,

multiple male employees in the Plaintiff's office also lost their jobs.  *See Peralta v. Roros 940,

Inc.* 72 F. Supp. 3d 385, 393 (E.D.N.Y. 2014) (finding genuine issue as to pretext where only the

pregnant plaintiff was fired, yet her employer failed to discipline non-pregnant employees for the

same misconduct).

The Plaintiff also fails to identify any specific individuals at Ferrellgas as having made

negative comments concerning her pregnancy.  She raises only general assertions that she was

terminated for her lack of commitment to the company. This is insufficient to create a genuine question of material fact as to pretext. *See Kerzer*, 156 F.3d at 403 (finding a genuine question as to pretext based on (1) supervisor's specific negative comments about the Plaintiff's pregnancy, (2) an allegation that the supervisor became unfriendly following the Plaintiff's pregnancy announcement, (3) a request that the Plaintiff return to work earlier than expected, (4) her firing shortly after returning to work, and (5) her replacement by a non-pregnant employee); *see McCullough v. Fin. Info. Servs. Agency*, 923 F. Supp. 54, 57 (S.D.N.Y. 1996) ("Plaintiff fails to support his conclusory allegation by providing any evidence whatsoever."). The Plaintiff here, at best, makes out only two of those five factors listed in *Kerzer*. Accordingly, even if she had stated a *prima facie* discrimination case, the claim would ultimately fail.

### D. As to the Plaintiff's Title VII and NYSHRL Retaliation Claims

#### 1. Legal Standards

To establish a *prima facie* Title VII retaliation case, "'a plaintiff must show (1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that she suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action.'" *EEOC v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 423 (E.D.N.Y. 2016) (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)) (citation omitted). Courts apply the same analysis to claims raised under the NYSHRL. *See Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013).

Courts assess Title VII and NYSHRL retaliation claim sunder the *McDonnell Douglas* burden shifting framework. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2015). Under

this standard, "[f]irst, the plaintiff must establish a *prime facie* case of retaliation. If the plaintiff succeeds, then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010); *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 n.6 (2d Cir. 2011). If the employer succeeds at the second stage, the presumption of retaliation dissipates, and the plaintiff must show that, *but for* the protected activity, she would not have been terminated. *See Mestecky v. New York City Dep't of Educ.*, --- F. App'x ----, 2019 WL 5783302, at *1 (2d Cir. 2019) (summary order); *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015).

### 2. Application to the Facts of this Case

The Defendants argue that the Plaintiff lacks sufficient evidence of a causal connection between the complaint and the elimination of her job because (a) she lacks direct evidence of retaliatory animus with regard to her complaint; (b) she does not point to any male or non-pregnant female co-worker who engaged in protected activity but was treated more favorably; and (c) she lacks a sufficient temporal relationship between the complaint and her termination. ECF 47 at 30–31. They further argue that Ferrellgas had legitimate, non-retaliatory reasons for firing the Plaintiff—the company-wide RIFs—and that the Plaintiff has no basis to conclude that such reasoning was pretextual. *Id.* at 31.

In opposition, the Plaintiff argues that she has meet the *prima facie* retaliation standard as to the fourth prong in that both her reassignment and her termination constituted adverse employment actions, and that there is a close temporal relationship between her complaint and those actions. ECF 49 at 19–22. She also reiterates the arguments made as to her FMLA retaliation claim as to the lack of a non-retaliatory motive and pretext. *Id.* at 22–23.

In reply, the Defendants argue that the Plaintiff's reassignment cannot constitute an adverse employment action because she had already been reassigned at the time of her complaint. ECF 50 at 9. They also reiterate their earlier arguments. *See generally id.*

For the reasons listed in subsection B of this opinion, the Court denies the Title VII and NYSHRL retaliation claims. To summarize that rationale, the Court rules that the Plaintiff has raised a *prima facie* claim with regard to her reassignment; that the Defendants nonetheless had a non-retaliatory reason for reassigning the Plaintiff that is not pretextual; that the Plaintiff fails to establish a causal connection between her complaint and her termination; and, even if she had, the Defendants again had a non-retaliatory, non-pretextual reason for terminating her.

### E. As to Guadagno's individual liability.

The Plaintiff devotes a section of her opposition to contend that Defendant Guadagno is individually liable for discriminating and retaliating against her. The Court has already ruled that all of the Plaintiff's claims fail. Accordingly, Defendant Guadagno bears no individual liability.

## III. CONCLUSION

For the foregoing reasons, the Court grants the Defendants' Rule 56 motion for summary judgment in its entirety, and the action is dismissed. The Clerk of the Court is respectfully directed to close this case.


It is **SO ORDERED.**



_____/s/ Artur D. Spatt_____             \_\_\_\_January 10, 2020\_\_\_\_\_

Arthur D. Spatt, U.S.D.J.                                            Date